**STATE OF HAWAI'I**, Plaintiff–Appellee v. **ALFRED CABABAG**, Defendant–Appellant

NO. 15758

(FC–CR. NO. 91–1887)

APRIL 16, 1993

BURNS, C.J., HEEN, AND WATANABE, JJ.

## OPINION OF THE COURT BY BURNS, C.J.

Defendant Alfred Cababag (Cababag) appeals the family court's November 13, 1991 judgment, upon a jury's verdict, convicting him of abuse of family and household members, Hawai'i Revised Statutes (HRS) § 709–906 (1985), and sentencing him to sixty days of incarceration and completion of the Child and Family Services' Anger Management Program. The family court stayed his incarceration pending this appeal.

Cababag contends that the family court erred when it decided that one of the State's witnesses was an expert in domestic violence and allowed her testimony into evidence. We affirm.

## FACTS

Cababag and Susan Cuthbertson (Cuthbertson) started living together as boyfriend and girl friend in August 1990. They were still living together at the time of Cababag's trial in September 1991.

In the morning hours of Friday, March 8, 1991, Honolulu Police Officers Mark Tamanaha (Officer Tamanaha) and Alfred Santiago (Officer Santiago) went to a residence in Wahiawa to investigate a disturbance. There, Officer Tamanaha saw Cababag and a female, was informed by Cababag that there had been an argument, and left "after everything appeared to be calmed down and settled[.]"

At approximately 3:15 p.m. that same day, Police Officer Darren Kitagawa (Officer Kitagawa) went to the same residence.

He observed Cuthbertson crying, very upset, slightly limping, walking a bit gingerly, and with minor cuts and scratches on both sides of both forearms and hands, some of which were bleeding. Cuthbertson told him that she "was beaten by her boyfriend and he wouldn't let her leave." Officer Kitagawa arrested Cababag.

At 4:00 p.m., Cuthbertson gave the police her written statement as follows:

> On March 8th 1991 at 1:00 p[.]m[.] Alfred Cababag and I got into an arguement [sic]. And I got in my truck with [the] cat to leave. Alfred tried to break the driver's side glass and was unable to. Then went in back of my truck. And then hopped into the back of the truck. I then started reversing into the street at which time he broke my sliding glass window with his fist. He reached in and pulled the keys out and the [sic] unlocked the door (Driver[']s side) and pushed me over to the passenger side into the glass. Then he drove my truck forward into the drive way. He pulled me out of the truck (Driver[']s side[)] then threw me on the ground and picked me up I let my cat go and threw me into the cement stairs and I landed on my back. I have back pain and some cuts and scratches on my back. I wish to persue [sic] this matter. During the argument he tossed my keys over the garage and they were lost[.] Alfred and I have been living together for seven months.

On March 12, 1991, the State charged Cababag with abuse of family and household members.

On August 30, 1991, Cababag filed his pretrial Motion in Limine Number 2 (ML2) "for an Order excluding from trial all testimony of Laura Crites or any similar 'expert' witness." ML2 was decided orally on September 17, 1991 and in writing on June 3, 1992. In its "Findings of Fact, Conclusions of Law and Order Partially Granting and Partially Denying Defense Motion in Limine Number 2 Regarding State's Calling Nanci Kreidman as an

Expert in Domestic Violence" entered on June 3, 1992, the family court decided in relevant part as follows:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Due to [Kreidman's] knowledge, skill, experience, training, education and personal involvement in the field of domestic violence for a substantial period of time, including her work with alleged victims and perpetrators, her participation in the preparation of various materials including manuals, her teaching at college levels, her video production for public dissemination, and in particular, working in the counseling field with both alleged abuse victims and abusers, and her unrebutted testimony as to her familiarity with the expert theories in the field of domestic violence, the Court qualifies [Kreidman] as an expert in domestic violence under the standards of *State v. Batangan*, 71 Haw. 552[, 799 P.2d 48] (1990).

\* \* \*

3. Based upon [Kreidman's] testimony, it does appear that the seemingly bizarre behavior of alleged victims of domestic violence such as recantation, minimization, and other related behavior, is similar to the seemingly bizarre behavior of child sexual abuse victims, as the Supreme Court itself acknowledged in *State v. Batangan*.

4. This seemingly bizarre behavior of alleged victims is beyond the knowledge or understanding of lay persons who normally serve on juries, and perhaps, also beyond the knowledge and understanding of participants who work in the criminal justice system itself, and does require a special expertise to understand.

\* \* \*

8.  [Kreidman] will be qualified as an expert in domestic violence, assuming that the appropriate expertise is shown during the trial by the State during direct examination of [Kreidman].

9.  [Kreidman's] expert testimony will have certain strict limitations:  [Kreidman] will not be permitted to express any opinion about whether abuse occurred in the instant case, or whether the alleged victim's report of abuse, either to the police initially, or in her testimony at trial, is truthful or untruthful.

\* \* \*

10. [Kreidman] has not personally met [Cuthbertson] or [Cababag] and is not familiar with the facts of this case; this would appear to insure that she could not express an opinion about either the credibility of [Cuthbertson] or about whether abuse occurred.

11. The Court will not allow [Kreidman] to state what percentage of alleged victims are female versus what percentage are male . . . , since this would appear to create a presumption that [Cababag] is an abuser.

12. The Court will not allow [Kreidman] to reference any aspect of the criminal law that requires mandatory punishment or mandatory incarceration for abusers, . . . .

13. The Court will not allow [Kreidman] to offer any testimony of predicting future violence by [Cababag], . . . .

14. The Court will not allow [Kreidman] to express any opinion about whether alleged victims of domestic abuse tend to exaggerate or not, . . . .

\* \* \*

During the trial, on September 18, 1991, Cuthbertson admitted to being visited by the police on the morning of March 8, 1991,

being contacted by the police that afternoon, and writing and signing her written statement, but testified that she "made up" the story she told in her written statement.

The State called Kreidman to testify as its expert on domestic violence. Over Cababag's objection, the family court found Kreidman "to be an expert in domestic violence[.]" Kreidman testified in relevant part as follows:

Q. In your opinion, and based on your training and experience, are there distinct behaviors or characteristics that victims of domestic violence show or exhibit?

A. Yes, there are.

Q. Are these characteristics seen from one victim to the next; in other words, are these characteristics or behaviors or some combination thereof fairly consistent from one victim to the next?

A. Yes, I would say they are.

Q. What types of characteristics or behaviors are these?

A. The demonstration of ambivalence, where a person has difficulty making up their [sic] mind.

Q. Making up their [sic] mind about what?

A. About what they want to do, what measures they want to take or choices or what direction they want to go.

Q. About a relationship?

A. Yes.

Q. What other types of behaviors are seen commonly?

A. Minimization.

Q. What is minimization?

A. It's an attempt to minimize how serious violence may be in the relationship, looking at the individual acts as not being that significant.

Q. Who is it that minimizes the behaviors?

A. Both the perpetrator and the victim minimize the behavior, or the seriousness of the behavior.

Q. What other types of behaviors do you see?

A. Self blame. A woman very often times will take responsibility for the violence . . . .

\* \* \*

Q. Are you familiar with the phenomenon called recantation?

A. Yes.

Q. What is that?

A. That is when a person says something and then, at a later point, decides that they [sic] want to change their story and take back what they originally said.

Q. Is this something that victims do in abusive relationships?

A. Yes.

Q. Have you seen or counseled women who have reacted in this way.

A. Yes, I have.

Q. Is recantation one of the characteristic behaviors that women display or exhibit when they have been in an abusive relationships [sic]?

A. It may be. It's very closely related to the ambivalence; like, "I kind of want to do this. I really want him to get help, but I don't want him to get in trouble. Maybe if he gets in trouble it will be worse for me and, so, maybe I'll just forget it and take back what I said and it will all be better."

After Kreidman testified, Cababag moved to strike her testimony and instruct the jury to disregard it or declare a mistrial because Kreidman testified that "recantation may be a behavior of battered women" and that "is not testimony to a reasonable degree

of certainty in a professional or expert field that would allow the jury to consider it as expert testimony."

## DISCUSSION

In this appeal, Cababag contends that the family court reversibly erred when it (a) denied ML2; (b) permitted Kreidman to testify as an expert; and (c) denied Cababag's motion for mistrial. Specifically, Cababag contends that (a) Kreidman was not a qualified expert; (b) her opinion testimony was not based on an explicable and reliable system of analysis; (c) her opinion testimony regarding recantation was irrelevant and an impermissible intrusion into the jury function of determining credibility; (d) admission of opinion testimony on the phenomena of abusive relationships improperly imputed prior bad acts to Cababag; and (e) any probative value of this evidence was outweighed by its prejudicial effect.

Hawai'i Rules of Evidence (HRE) Rule 702 provides as follows:

> **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

In *Larsen v. State Sav. & Loan Ass'n*, 64 Haw. 302, 640 P.2d 286 (1982), the Hawai'i Supreme Court specified three decisions the trial court must make before admitting expert testimony into evidence. They are that (1) the witness is in fact an expert; (2) the subject matter of the inquiry is of such a character that only persons of skill, education, or experience in it are capable of a correct judgment as to any facts connected therewith; and (3) the expert testimony will aid the jury to understand the evidence or determine a fact in issue. *See State v. Castro*, 69 Haw. 633, 756 P.2d 1033 (1988).

With respect to decision (1), the *Larsen* court said:

> It is not necessary that the expert witness have the highest possible qualifications to testify about a particular matter, . . . but the expert witness must have such skill, knowledge, or experience in the field in question as to make it appear that his opinion or inference–drawing would probably aid the trier of fact in arriving at the truth. . . . Once the basic requisite qualifications are established, the extent of an expert's knowledge of the subject matter goes to the weight rather than the admissibility of the testimony.

*Larsen*, 64 Haw. at 304, 640 P.2d at 288 (citations and footnote omitted).

In our view, the question whether a person is an expert is a question of law. The person either is or is not an expert, and there is only one right answer. However, *Larsen* also stated that:

> The question of whether a witness qualifies as an expert is a matter addressed to the sound discretion of the trial court, and such determination will not be overturned unless there is a clear abuse of discretion.

*Id.* (citations omitted).

> Thus, *Larsen* is authority that:

> Liberality and flexibility in evaluating qualifications should be the rule; the proposed expert "should not be required to satisfy an overly narrow test of his own qualifications." The trial court has wide discretion in determining the competency of a witness as an expert with respect to a particular subject.

M. GRAHAM, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6642 (Interim Ed. 1992) (citations omitted). In other words, the trial court's discretion to qualify a witness as an expert is wider than its discretion not to do so.

After the trial court makes the three *Larsen* decisions, it must make a fourth decision under HRE Rule 403, which states as follows:

> **Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

With respect to decision No. 1, we conclude that the family court did not abuse its discretion when it decided that Kreidman was an expert. Kreidman testified that she has a 1974 B.A. from Rutgers University in Communication and Psychology and a 1990 or 1991 Masters from the University of Hawai'i and the topic of her thesis was domestic violence, reviewing and evaluating community perceptions of the problem of domestic violence; has worked in the domestic violence field for fourteen years; has counseled both victims and perpetrators on an individual basis and in groups; has counseled "maybe a thousand or so" women and "[m]aybe three quarters or half as many" men; helped found and was working at the Domestic Violence Clearing House and Legal Hotline; has taught a Sexual Assault and Family Violence course at Chaminade University and Leeward Community College; has attended workshops, conferences, and seminars on the subject; wrote a television documentary and two manuals; co–authored a clinic; has trained police officers, judges, teachers, counselors, social–service aides, social workers, and family planning clinic providers; was the chair of the Oahu Spouse Abuse Task Force; is facilitating the Domestic Violence Task Force; and in other family court cases was qualified to testify as an expert in the field of domestic violence.

With respect to decisions Nos. 2, 3, and 4, Cababag's challenge is supported by *State v. Thomas*, 66 Ohio St. 2d 518, 423 N.E.2d 137 (1981), which held that the subject of expert testimony on the battered housemate/spouse syndrome is within the understanding of the jury; the battered housemate/spouse syndrome is not sufficiently developed, as a matter of commonly accepted scientific knowledge, to warrant testimony under the guise of expertise; and the battered housemate/spouse syndrome's prejudicial impact outweighs its probative value. However, *Thomas* has been overruled by *State v. Koss*, 49 Ohio St. 3d 213, 551 N.E.2d 970 (1990), which concluded that the battered housemate/spouse syndrome has gained substantial scientific acceptance to warrant admissibility.

*Koss, supra*, which involved the battered housemate/spouse syndrome, is consistent with the Hawai'i appellate court decisions with respect to the sexually abused child syndrome. *See State v. Batangan*, 71 Haw. 552, 799 P.2d 48 (1990); *State v. Castro*, 69 Haw. 633, 756 P.2d 1033 (1988); *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982); *State v. Rinehart*, 8 Haw. App. 638, 819 P.2d 1122, *cert. denied*, 72 Haw. 619, 841 P.2d 1075 (1991).

In *Batangan, supra*, the Hawai'i Supreme Court stated as follows:

> The common experience of a jury, in most cases, provides a sufficient basis for assessment of a witness' credibility. Thus, expert testimony on a witness' credibility is inappropriate. *Kim*, 64 Haw. at 607, 645 P.2d at 1337. However, sexual abuse of children "is a particularly mysterious phenomenon." *State v. Castro*, 69 Haw. 633, 648, 756 P.2d 1033, 1044 (1988), "and the common experience of the jury may represent a less than adequate foundation for assessing the credibility of a young child who complains of sexual abuse." *State v. Myers*, 359 N.W.2d 604, 610 (Minn. 1984).

While jurors may be capable of personalizing the emotions of victims of physical assault generally, and of assessing witness credibility accordingly, tensions unique to trauma experienced by a child sexually abused by a family member have remained largely unknown to the public. ... [T]he routine indicia of witness credibility — consistency, willingness to aid the prosecution, straight forward rendition of the facts — may, for good reason be lacking. As a result jurors may impose standards of normalcy on child victim/witnesses who consistently respond in distinctly abnormal fashion. *[State v.] Moran*, 151 Ariz. at 381, 728 P.2d at 251 (1986) (quoting *State v. Middleton*, 294 Or. 427, 440, 657 P.2d 1215, 1222 (1983) (Roberts, J., concurring)).

Child victims of sexual abuse have exhibited some patterns of behavior which are seemingly inconsistent with behavioral norms of other victims of assault. Two such types of behavior are delayed reporting of the offenses and recantation of allegations of abuse. Normally, such behavior would be attributed to inaccuracy or prevarication. *People v. Hampton*, 746 P.2d 947, 952 (Colo. 1987); *Wheat [v. State]*, 527 A.2d at 273 [(Del. Super. Ct. 1987)]; *Allison v. State*, 179 Ga. App. 303, 308, 346 S.E.2d 380, 384–385 (1986); *[State v.] Myers*, 359 N.W.2d 604, 610 (Minn. 1984); *State v. Middleton*, 294 Or. at 440, 657 P.2d at 1219–1220 (1983) (Roberts, J., concurring). In these situations it is helpful for the jury to know that many child victims of sexual abuse behave in the same manner. Expert testimony "[e]xposing jurors to the unique interpersonal dynamics involved in prosecutions for intrafamily child sexual abuse," *Wheat*, 527 A.2d at 273, "may play a particularly useful role by disabusing the jury of some widely held misconceptions

... so that it may evaluate the evidence free of the constraints of popular myths," *People v. Gray*, 187 Cal. App. 3d 213, 218, 231 Cal. Rptr. 658, 660–661 (1986) (citations and internal quotation marks omitted).

*Batangan*, 71 Haw. at 556–558, 799 P.2d at 51–52.

Applying the rationale in *Batangan*, a case involving the sexually abused child syndrome, to this case involving the battered housemate/spouse syndrome, we conclude that the family court did not abuse its discretion when it entered decisions Nos. 2, 3, and 4 with respect to Kreidman's testimony. Kreidman's testimony was evidence that at the trial of an alleged male batterer of a woman with whom he is living, where the woman recants her pretrial accusations that she was battered by the male, one reasonable explanation for the recantation is the battered housemate/spouse syndrome. This evidence of the battered housemate/spouse syndrome was relevant specialized knowledge that was unknown to the average juror and aided the jury in determining the credibility of the woman's testimony.

Our decision is in accord with *Arcoren v. United States*, 929 F.2d 1235 (8th Cir. 1991), *cert. denied*, ___ U.S. ___, 112 S. Ct. 312, 116 L. Ed. 2d 255 (1991), in which the alleged battered woman was the estranged wife of the alleged male batterer.

## CONCLUSION

Accordingly, we affirm the family court's November 13, 1991 judgment convicting defendant Alfred Cababag of abuse of family and household members, HRS § 709–906 (1985).

*Dale K. Mattice*, Deputy Public Defender, on the brief for defendant–appellant.

*Doraine Meyer Belnap*, Deputy Prosecuting Attorney, on the brief for plaintiff–appellee.