907 P.2d 758

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Muao MAELEGA, also known as Muao Eneligo Maelega, and Muao Eneligo Maeleca, Defendant–Appellant.**

**No. 17738.**

Supreme Court of Hawai'i.

Dec. 7, 1995.

---

Anthony H. Yusi, on the briefs, Honolulu, for defendant-appellant.

Loretta A. Matsunaga, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., KLEIN, and LEVISON, NAKAYAMA and RAMIL, JJ.

KLEIN, Justice.

Muao Maelega was indicted on December 10, 1992 for Murder in the Second Degree in violation of Hawai'i Revised Statutes (HRS) § 707–701.5 (1993).[1] After a jury trial, Maelega was found guilty and convicted as charged. On December 16, 1993, the circuit court sentenced him to a term of life imprisonment with the possibility of parole. Maelega subsequently filed this timely appeal. We reverse and remand for a new trial.

## I. BACKGROUND

Maelega was born and raised in American Samoa, where he met Eyvette Liufau in April 1990. Eyvette moved from Hawai'i to American Samoa after she completed the ninth grade, then moved back to Hawai'i in July 1990 after she finished high school. In Hawai'i, Eyvette lived in a two-bedroom apartment with her mother, stepfather, younger half-sister, and cousin.

Maelega and Eyvette kept in contact after she left American Samoa. Eyvette eventually told Maelega that she was pregnant with his child, and Maelega came to Hawai'i in November 1990. They were married on Jan-

uary 3, 1991. Eyvette subsequently gave birth to a premature child on February 11, 1991 and was discharged from the hospital on February 14, 1991.

According to the testimony of Dr. Edward Brennan, a clinical psychologist who interviewed Maelega for the defense, Eyvette purportedly told Maelega upon her discharge from the hospital that the child was not his and that she had been sexually assaulted by her stepfather. Maelega and Eyvette stayed with a family friend that night. On February 15, 1991, Eyvette called her granduncle Tuafala Sila Unutoa, who served as the Talking Chief of her extended family in Hawai'i, and asked if they could stay with him. Because the housing rules of his apartment complex would not permit it, Unutoa declined. Eyvette and Maelega then returned to her parent's home, where they confronted her stepfather with the allegation of sexual assault. After punching Eyvette's stepfather in the mouth, Maelega took Eyvette to the police to report the alleged sexual assault. When the officer informed Eyvette that he could not guarantee that her stepfather would be immediately arrested and incarcerated, the complaint was withdrawn.

On the morning of February 16, 1991, Eyvette once again telephoned Unutoa, this time telling him about the alleged sexual assault. Unutoa called a family meeting, during which Eyvette's stepfather swore that he had not done anything. Eyvette then recanted, indicating that she had made up the story because she was afraid and tired of being beaten by her husband. Unutoa suggested that Maelega and Eyvette sleep in separate apartments that evening, but they refused. When Eyvette and Maelega discussed their situation later on, she told him that he should return to American Samoa. Maelega professed his love for her, and suggested that they put up the child for adoption. Maelega told Dr. Brennan that based on what he perceived as "waffling" by Ey-

---

[1] HRS § 707–701.5 provides in pertinent part that "a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

Maelega was previously indicted for the same alleged offense on February 20, 1991 under Cr.

No. 91–0423. However, the indictment was dismissed for violation of Hawai'i Rules of Penal Procedure (HRPP) Rule 48(b) on December 9, 1992.

vette on the issue of adoption, he thought that she was more committed to her stepfather than to him. Nevertheless, they went to sleep without further incident.

On February 17, 1991, Maelega claims that he awoke in the morning to find that Eyvette was not in bed with him. According to Dr. Brennan, Maelega told him that when Eyvette returned she was "all sweaty and ... she smelled[.]" Maelega suspected that she had just returned from having sexual relations with her stepfather. He became convinced of this after examining her vaginal area and abdomen and discovering that her stitches were broken. Dr. Brennan further testified that Maelega told him Eyvette "just remained silent" and did not deny his suspicions. After hearing Eyvette crying, Eyvette's mother entered the locked bedroom (her other daughter picked the lock for her) and saw Eyvette lying on the bed holding her neck. According to her mother, Eyvette said that Maelega tried to choke her. After a brief struggle, all three persons ended up in the living room. As Eyvette sat on the couch, Eyvette's mother attempted to keep Maelega from a drawer that held several knives. Believing that she had succeeded, Eyvette's mother proceeded to call Unutoa, who told her to call the police. Maelega then yanked Eyvette off the couch, and took her back into the bedroom, knocking her mother to the floor as she tried to hold on to Ey-

vette. Maelega then locked and barricaded the door.

As Eyvette cried for help, Maelega choked her with his hands, strangled her with an electric cord (which he wrapped around her neck three times and then knotted), slashed open her throat, and stabbed her in the back and breasts.

At trial, Maelega claimed that he acted under an extreme emotional disturbance. HRS § 707–702(2) (1993).[2] During closing arguments before the jury, the prosecutor focused on the requirement that there be an objectively reasonable explanation for Maelega's purported extreme mental or emotional disturbance. The prosecutor suggested that this mitigating defense would not apply to a member of the Ku Klux Klan (KKK) who killed another person as a result of the honestly-held belief that the victim was less than human, or was somehow ruining the country, and deserved to die. Maelega objected to these comments, but the circuit court overruled his objection. The prosecutor then drew an analogy to the instant case, arguing that, to the extent that Maelega's emotional state resulted from his realization that he was losing control over Eyvette,[3] Maelega did not act while under an extreme mental or emotional disturbance for which there is a reasonable explanation. Maelega then moved for a mistrial, but the circuit court denied his motion.

2. HRS § 707–702(2) provides:
[i]n a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he [or she] believed them to be.

3. The prosecution sought to rebut Maelega's defense of extreme mental or emotional disturbance by arguing that his homicidal act represented the ultimate act of control over Eyvette rather than the absence of self-control due to an emotional or mental disturbance. In other words, Maelega's desire for absolute control over Eyvette resulted in extreme violence when she attempted to either leave the relationship or enlist the aid of others in dealing with her abusive husband. The prosecution introduced testimony by several individuals (including members of Ey-

vette's family, her neighbors, a hospital psychologist who evaluated Eyvette after an apparent suicide attempt, other hospital staff members, and the manager of the store where she worked) suggesting that Maelega either abused Eyvette or exercised an inordinate amount of control over her. A nurse testified that when she asked Maelega why he beat up Eyvette in the Labor & Delivery Room of the hospital, he responded "that in Samoa it's okay for them to beat up their wives and their children for obedience." Finally, the prosecution introduced testimony by an expert in the field of domestic violence, Ms. Nanci Kriedman, who testified that the dominant party in an abusive relationship will often act violently to reassert their dominance and control, especially when the victim attempts to break free of the relationship. In other words, the phenomenon of "separation assault" involves acts of violence toward one's partner that are committed for a purpose; such acts are not caused by extreme mental or emotional disturbance.

The circuit court eventually gave the following extreme mental or emotional instruction (EMED instruction) over Maelega's objection:

> The defense of extreme mental or emotional disturbance places the *initial burden on the defendant to come forward with some credible evidence of facts constituting a defense* unless those facts are supplied by the prosecution's witnesses. *If this occurs,* the prosecution must then prove beyond a reasonable doubt that the defendant was not at the time of the offense under the influence of extreme mental or emotion [sic] disturbance for which there is a reasonable explanation.

(Emphases added.)

When the jury later asked for a definition of *extreme* mental or emotional disturbance, the court responded: "Kindly use your common sense and *life experience* in determining what is extreme mental or emotional disturbance." (Emphasis added.)

## II. *STANDARD OF REVIEW*

■ "In reviewing jury instructions, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Hoey,* 77 Hawai'i 17, 38, 881 P.2d 504, 525 (1994). *See also State v. Pinero [Pinero II ],* 75 Haw. 282, 292–93, 859 P.2d 1369, 1375 (1993); *State v. Kelekolio,* 74 Haw. 479, 514–15, 849 P.2d 58, 74 (1993).

4. Maelega also argues on appeal that: the court erroneously permitted the jury to consider matters not presented during trial by inviting them to rely on their "life experience"; HRS § 707–702(2) is void for vagueness because "extreme mental or emotional disturbance" is not defined; the court's failure to grant a mistrial based on the prosecutor's references to the KKK deprived him of his right to be tried by an impartial jury; the court erroneously denied his motion to quash the indictment where the jurors' street addresses and telephone numbers were redacted on the jury qualification forms; even if the court's errors were independently harmless, their cumulative effect warrants reversal of the circuit court's order denying his motion for mistrial and/or a new trial; the court erroneously failed to dismiss the indictment where the evidence presented to the grand jury *clearly* established the lesser offense of manslaughter; the court erroneously

## III. *DISCUSSION*

■ Maelega asserts three points of error on appeal that are worthy of discussion: 1) the EMED instruction erroneously shifted the burden of proof to Maelega; 2) the court erroneously admitted Kriedman's testimony; and 3) the court abused its discretion in admitting evidence of Maelega's prior bad acts.[4] Because we agree that the EMED instruction was prejudicially erroneous and misleading, we reverse and remand for a new trial.

### A.

In *State v. Nobriga,* 10 Haw.App. 353, 873 P.2d 110 (1994), the Intermediate Court of Appeals (ICA) held that:

> the [prosecution] has the initial burden of negativing statutory exceptions to an offense only if the exceptions are incorporated into the definition of the offense. If a statutory exception to an offense constitutes a separate and distinct defense, however, the [prosecution's] burden to disprove the defense beyond a reasonable doubt arises only after evidence of the defense is first raised by the defendant. The initial burden in such instances is on the defendant "to come forward with some *credible evidence* of facts constituting the defense, unless, of course, those facts are supplied by the prosecution's witnesses."

*Id.* at 359, 873 P.2d at 113 (citing Commentary to HRS § 701–115 (1985)) (emphasis added).[5] *Nobriga* involved a conviction of

denied his motion for judgment of acquittal where Kriedman's testimony concerning "control" over the victim of domestic violence was not inconsistent with a finding that he was also under the influence of an extreme emotional disturbance—especially because Kriedman was not allowed to give an opinion on Maelega's volitional capacity at the time he killed Eyvette; and the court erred in failing to dismiss the original indictment *with prejudice* for violation of HRPP Rule 48, *see supra* note 1. These claims are without merit.

5. The ICA also relied upon HRS § 701–115 (1985), which provided that "[n]o defense may be considered by the trier of fact unless evidence of the specified fact or facts [which negative penal liability have] been presented." Given the absence of any facts to support the application of

animal nuisance under Revised Ordinances of Honolulu (ROH) § 7.2.3 (1990), which provides in pertinent part that "[i]t is unlawful to be the owner of an animal, farm animal or poultry engaged in animal nuisance as defined in Section 7–2.2[.]"[6] However, ROH § 7–2.4(a) established a specific exception to the offense of animal nuisance: "[n]othing in this article applies to animals, farm animals or poultry raised, bred or kept as a commercial enterprise or for food purposes where commercial kennels or the keeping of livestock is a permitted use." Because Nobriga "offered absolutely no evidence at trial, and the facts constituting his defense were not supplied by the [prosecution], the [prosecution] was not required to present any evidence disproving [Nobriga's] defense beyond a reasonable doubt." *Nobriga*, 10 Haw.App. at 360, 873 P.2d at 114 (footnote omitted).

In the instant case, Maelega, unlike Nobriga, met his burden of producing evidence at trial to support his asserted defense. By giving the EMED instruction to the jury, the circuit court implicitly acknowledged that, based on the record, a reasonable juror could harbor a reasonable doubt as to whether Maelega acted while under an extreme emotional disturbance for which there was a reasonable explanation when he killed Eyvette. *Cf. State v. Russo*, 69 Haw. 72, 76, 734 P.2d 156, 158 (1987) (holding that the trial court is not obligated to instruct the jury on the mitigating defense of extreme mental or

emotional disturbance manslaughter if evidence to support the defense is clearly lacking). *See also* HRS § 701–115(2) (1993) ("No defense may be considered by the trier of fact unless evidence of the specified fact or facts has been presented."). The court was then required to instruct the jury that the prosecution had the burden of disproving this defense beyond a reasonable doubt. *Cf. Raines v. State*, 79 Hawai'i 219, 900 P.2d 1286 (1995).[7]

In the instant case, however, the court impliedly instructed the jury that the burden under HRS § 701–115(2) was a question of fact for the jury to decide. Although Maelega did indeed bear the burden of *production* with respect to evidence supporting the mitigating defense of "extreme mental or emotional disturbance manslaughter" (EMED manslaughter), the circuit court should not have referred to this burden in its instructions to the jury. By doing so, the circuit court erroneously advised the jury that it could reject the mitigating defense of EMED manslaughter because Maelega had failed to discharge some burden of proof that was imposed on *him*, rather than because the prosecution had succeeded in negativing the defense beyond a reasonable doubt. *See Raines*, 79 Hawai'i at 226, 900 P.2d at 1293; *Russo*, 69 Haw. at 76, 734 P.2d at 158; *Hawaii [Hawai'i] Standard Jury Instructions, Criminal* No. 5.02 (December 1991).[8]

the statutory exception, *see infra* this subsection, the ICA downplayed the significance of HRS § 701–114(1)(a) (1985) (placing the burden on the prosecution to prove beyond a reasonable doubt each element of the offense with which a defendant is charged) and HRS § 702–205(b) (1985) (defining the elements of an offense to include such conduct, attendant circumstances, and results of conduct as would negative a defense to the offense charged). *Id.* at 358, 873 P.2d at 112.

6. ROH § 7–2.2 provides in pertinent part:

"Animal nuisance," for the purposes of this section, shall include but not be limited to any animal, farm animal or poultry which:
(a) Makes noise continuously and/or incessantly for a period of 10 minutes or intermittently for one-half hour or more to the disturbance of any person at any time of day or night and regardless of whether the animal, farm animal or poultry is physically situated in or upon private property[.]

7. In *Raines*, we observed that the trial court's failure to instruct the jury as to the prosecution's burden of disproving beyond a reasonable doubt the mitigating defense of extreme emotional disturbance manslaughter—especially where the court included an instruction as to the prosecution's identical burden with respect to the defense of justification or self-defense—created "a substantial risk that the jury may have mistakenly concluded that [the defendant] had the burden of proving that he acted under an extreme emotional disturbance." *Id.* at 224, 900 P.2d at 1291. Accordingly, we held that the court committed plain error in omitting the burden of proof instruction. *Id.* at 226, 900 P.2d at 1293 (citing *State v. Hoey*, 77 Hawai'i 17, 38–39, 881 P.2d 504, 525–26 (1994); *State v. Kupau*, 76 Hawai'i 387, 392–96, 879 P.2d 492, 497–501 (1994)).

8. Although the court properly instructed the jury with respect to EMED manslaughter in two paragraphs immediately preceding its "initial burden

In other words, the jury may have reasonably, but impermissibly, interpreted the court's EMED instruction as requiring Maelega to convince it that the evidence tending to support his claim was credible— i.e., that he acted under an extreme mental or emotional disturbance for which there was a reasonable explanation when he killed Eyvette—*before* considering whether the prosecution had disproved this defense beyond a reasonable doubt.[9] Thus, there was a substantial risk that the jury may have reached its verdict by improperly shifting the burden of proof from the prosecution to Maelega when it concluded that *Maelega* had not established his claim of EMED manslaughter. Such burden shifting violates the due process clauses of the fourteenth amendment to the United States Constitution and article I, section 5 of the Hawai'i Constitution. *State v. Pone,* 78 Hawai'i 262, 274, 892 P.2d 455, 467 (1995). Once the defendant or the prosecution has raised any facts in support of an alleged defense, the jury may not be given the opportunity to reject the defense as less than credible before the burden of proof beyond a reasonable doubt has been allocated by appropriate instruction to the prosecution. *Cf. Raines, supra.* Maelega's counsel preserved the error in the instant case by objecting to the EMED instruction on the ground that it incorrectly placed the initial burden of proof on Maelega.

The *Nobriga* court clearly relied upon the commentary to HRS § 701–115 when it stated that a defendant bears the initial burden of "com[ing] forward with some *credible* evidence of facts supporting the defense[.]" 10 Haw.App. at 359, 873 P.2d at 113 (emphasis added). Although "[t]he commentary . . . may be used as an aid in understanding the provisions of [the Hawai'i Penal] Code, . . . [it may] not [be used] as evidence of legislative intent." HRS § 701–105 (1993). Our cases have firmly established that "a defendant is entitled to an instruction on every defense or theory of defense having *any*

on the defendant" instruction, these instructions did not eliminate the prejudicial effect of the latter, more specific instruction regarding the burdens of proof. *Cf. Raines,* 79 Hawai'i at 225, 900 P.2d at 1292 (disapproving the dictum in *Pinero II,* 75 Haw. at 291, 859 P.2d at 1374, which suggests that "the court's general burden of proof instruction will be deemed sufficient to cover the issue"). In *Pinero II,* the court omitted an instruction that would have informed the jury that it could consider the offense of reckless manslaughter. However, several aspects of the record indicated that Pinero was not prejudiced by the erroneous instruction: instructions before and after the erroneous instruction clearly informed the jury that it was obligated to consider the elements of reckless manslaughter apart from EMED manslaughter; four verdict forms made clear that the jury could consider reckless manslaughter as an option; and both the prosecutor and defense counsel made clear throughout the trial (including their closing remarks) that a separate means of proving manslaughter existed, which required a reckless state of mind. 75 Haw. at 290–97, 859 P.2d at 1373–76.

In the instant case, rather than merely omitting an instruction that was otherwise conveyed to the jury, the circuit court improperly instructed the jury that Maelega had the "initial burden [of producing] . . . some credible evidence of facts constituting a defense" and improperly invited the jury to revisit the court's legal conclusion that Maelega already had met his burden of production by coming forward with evidence at trial to support his defense of EMED manslaughter. In other words, by indicating that the prosecution's burden of disproving the mitigating defense of EMED manslaughter would arise only after Maelega had met his initial burden, the EMED instruction created a substantial risk that the jury could mistakenly have concluded that Maelega bore the initial burden of convincing it that he acted while under an extreme emotional disturbance for which there was a reasonable explanation *before* considering whether the prosecution had disproved the mitigating defense of EMED manslaughter beyond a reasonable doubt. "[T]he *possibility* that the jury reached its decision in an impermissible manner requires reversal even though the jury may also have reached the same result in a constitutionally acceptable fashion." *Connecticut v. Johnson,* 460 U.S. 73, 85 n. 13, 103 S.Ct. 969, 976 n. 13, 74 L.Ed.2d 823 (1983) (citation omitted).

9. The jury in the instant case may reasonably have concluded that Maelega's purported defense was not credible—i.e., although plausible (and, therefore, not *incredible*), his claims were not entirely believable. However, whether or not he is guilty of the crime charged must be based on a finding that the *prosecution* has *disproved* beyond a reasonable doubt that he killed Eyvette while under the influence of an extreme emotional disturbance for which there was a reasonable explanation. In other words, even if the *weight* of the evidence suggests that the asserted defense does not apply to the defendant—e.g., his or her claim, although plausible, is not entirely believable—he or she is nevertheless entitled to have the jury consider the defense pursuant to the proper allocation of the burden of proof.

support in the evidence, provided such evidence would support the consideration of that issue by the jury, *no matter how weak, inconclusive, or unsatisfactory the evidence may be.*" *Pinero II,* 75 Haw. at 304, 859 P.2d at 1379 (emphases added) (internal quotation marks and citations omitted). *See also State v. Lira,* 70 Haw. 23, 27, 759 P.2d 869, 871, *reconsideration denied,* 70 Haw. 662, 796 P.2d 1005 (1988); *State v. O'Daniel,* 62 Haw. 518, 527–28, 616 P.2d 1383, 1390 (1980). Accordingly, we read *Nobriga* to state the obvious: If there is *no* evidence in the record

to support a separate and distinct defense, then the defendant is not entitled to an instruction on that defense. To the extent that *Nobriga's* reference to credible evidence is inconsistent with *Pinero II, supra,* it is hereby overruled.

■ After reading and considering the court's instructions as a whole, we are convinced that they were prejudicially erroneous and misleading; therefore, we hold that the court's failure to instruct the jury properly constituted reversible error.[10]

---

**10.** The concurring and dissenting opinion argues that the EMED instruction "is clearly *not* an incorrect statement of the law" "because common sense tells us that evidence of EMED must be credible in order to sustain a conviction, as [the EMED] instruction so indicates[.]" Concurring and Dissenting Opinion at 3 and 4 (emphasis in original). Thus, "the prosecution . . . *impliedly* carried its burden." *Id.* at 3 (emphasis added). The fallacy of this argument is that it fails to recognize that once the trial court instructed the jury on EMED manslaughter, Maelega had *no further burden to produce* evidence of his emotional state, and the jury could *not* have been instructed that *"if this occurs,* the prosecution must then prove beyond a reasonable doubt that [Maelega] was not . . . under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation." This instruction clearly misstates the law because it is *not* the province of the jury to second guess the judge's decision to instruct on EMED manslaughter and, by doing so, defer the prosecution's burden of proof until the jury is satisfied that the defendant has produced sufficient evidence to support the defense. Once the instruction is given, only one burden remains: the prosecution has the burden to disprove the defense of EMED manslaughter beyond a reasonable doubt. In other words, once relevant evidence has been presented—i.e., *any* evidence, "no matter how weak, inconclusive, or unsatisfactory"—the jury may not convict a defendant of murder *unless the prosecution proves beyond a reasonable doubt* either (1) that the defendant was not acting under an EMED or (2) that there was no reasonable explanation for the EMED.

Furthermore, the concurring and dissenting opinion's conclusion that we have "ma[de] the all too common mistake of underestimating the intelligence of the jury" is erroneous. *See supra* notes 8 and 9. Rather than insulting the intelligence of the jury in the instant case, we presume that it read and faithfully attempted to apply the court's instructions. Absent appropriate clarifying instructions by the trial court regarding the legal distinction between burdens of production and proof, we cannot ignore the reasonable possibility that Maelega was convicted on the basis of an unconstitutional understanding of the law—i.e., a misapprehension caused not by the jury's lack of intelligence, but resulting from the court's improper instructions. *Cf. Francis v. Franklin,* 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1989) (holding that a defendant's due process rights were violated when he was convicted pursuant to jury instructions that imposed a mandatory rebuttable presumption of intent and shifted the burden of persuasion on this issue to the defendant). In order to avoid the problem altogether, the trial court should not instruct the jury regarding the defendant's burden of production, because whether this burden has been met is a question that should be decided by the trial court as a matter of law.

Finally, Maelega's "'only defense* was that he . . . [acted while under an extreme emotional disturbance for which there was a reasonable explanation]. The facts did not overwhelmingly preclude that defense.'" *Franklin,* 471 U.S. at 325–36, 105 S.Ct. at 1977 (affirming the appellate court's conclusion that the erroneous instructions could not be deemed harmless) (emphasis added). Furthermore, "[t]he fact that the reviewing court may view the evidence [against the defense of EMED manslaughter] . . . as overwhelming is . . . simply irrelevant. To allow a reviewing court to perform the jury's function of evaluating the evidence . . . when the jury . . . may have performed that function [in an unconstitutional manner], would give *too much weight to society's interest in punishing the guilty and too little weight to the method by which such decisions of guilt are to be made.*" *Johnson,* 460 U.S. at 86, 103 S.Ct. at 977 (footnote omitted) (emphasis added). Paraphrasing *Johnson,* we observe that "[b]ecause we lack the dissent's confidence in predicting the sequence of a jury's deliberations, we find it impossible to conclude beyond a reasonable doubt that a conscientious jury, following its instructions, will evaluate the evidence [supporting a conclusion that the prosecution has met its burden of disproving the mitigating defense of EMED manslaughter] . . . and reach a conclusion on that issue before considering the applicability of the [defendant's initial burden of producing evidence in support of the defense] . . . about which it has been instructed." 460 U.S. at 86 n. 15, 103 S.Ct. at 977 n. 15, 74 L.Ed.2d 823.

Although not essential to our resolution of the instant appeal, we nevertheless discuss two additional issues raised by Maelega in order to provide guidance to the circuit court in the event of a retrial.

### B.

The circuit court qualified Kriedman as an expert in the field of domestic relations. She opined that dominant parties in abusive relationships will often act violently to reassert their dominance and control, especially when their victims attempt to break free from their relationships. Kriedman's testimony focused on the tactics of power and control utilized by perpetrators of domestic abuse, i.e., the "power and control wheel." The hub of the wheel represents the power that one person has over another in an abusive relationship. The outer portion of the wheel represents manifestations of abuse, e.g., physical and sexual violence. Although violence does not occur constantly in an abusive relationship, once it has taken place the victim knows that it can happen again. The spokes of the wheel represent the various ways in which a person with power can exercise control in the relationship. Kriedman testified that examples of such tactics, some of which are more subtle than others, include:

*Intimidation*—making the victim "afraid by using looks, gestures, smashing things, destroying her property, displaying weapons";

*Emotional Abuse*—making her feel bad about herself, calling her names, putting her down, making her think she's crazy, humiliating her, and making her feel guilty for being a "bad wife" or "bad mother";

*Isolation*—"[c]ontrolling what she does, who she sees and talks to, what she reads, where she goes, limiting her outside involvement and using jealousy to justify action";

*Minimizing, Denying, and Blaming*— "[m]aking light of abuse and not taking her concerns seriously, saying the abuse didn't

happen, shifting responsibility for abusive behavior, saying she caused it [for example, through acts of sexual infidelity]";

*Using Children*—"[m]aking her feel guilty about the children, using the children to relay messages, using visitation to harass her, threatening to take the children away";

*Using Male Privilege*—"[t]reating her like a servant, making all the big decisions, being master of the castle, being the one to define men's and women's roles";

*Economic Abuse*—"[p]reventing her from getting or keeping a job, making her ask for money, giving her an allowance, taking her money, not letting her know about or having access to family income"; and

*Using Coercion and Threats*—"[m]aking and carrying out threats to do something to hurt her, threatening to hurt her, threatening to leave her, commit suicide, to report her to welfare, making her drop charges, making her do illegal things."

Maelega contends that Kriedman's testimony should not have been admitted because her after-the-fact explanations of human behavior are neither falsifiable nor capable of being tested for accuracy. In other words, Maelega asserts that Kriedman's proffered testimony was more prejudicial than probative. The prosecution urges this court to apply the reasoning of the ICA in *State v. Cababag*, 9 Haw.App. 496, 850 P.2d 716 (1993), which validated analogous expert testimony by Kriedman as "other specialized knowledge" in the complex field of domestic violence. *Id.* at 508, 850 P.2d at 722.

■ "Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion." *State v. Montalbo*, 73 Haw. 130, 140–41, 828 P.2d 1274, 1281 (1992). *See also* Hawai'i Rules of Evidence (HRE) Rules 702, 703 (1993).[11]

■ In *Montalbo*, we reaffirmed the two-pronged analysis of proposed expert testimo-

---

11.  HRE Rule 702 provides:
**Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. *In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.*

ny outlined in *State v. Kim,* 64 Haw. 598, 645 P.2d 1330 (1982), *overruled on other grounds, State v. Batangan,* 71 Haw. 552, 799 P.2d 48 (1990)[12]:

> The critical inquiry with respect to expert testimony ... is whether such testimony "will *assist the trier of fact to understand the evidence or determine a fact in issue....*" [HRE Rule 702.] Generally, in order to so assist the jury an expert must base his [or her] testimony upon a sound factual foundation; any inferences or opinions must be the product of an *explicable and reliable system of analysis;* and such opinions must add to the common understanding of the jury. *See* [HRE Rule 703].

*Montalbo,* 73 Haw. at 138, 828 P.2d at 1280 (citing *Kim,* 64 Haw. at 604–05, 645 P.2d at 1336) (internal citations omitted) (emphases added). In other words, expert testimony must be both relevant and reliable.

We listed five factors relevant to the determination whether *scientific evidence* should be admitted at trial:

1) the evidence will assist the trier of fact to understand the evidence or to determine a fact in issue;

2) the evidence will add to the common understanding of the jury;

3) the underlying theory is generally accepted as valid;

4) the procedures used are generally accepted as reliable if performed properly;

5) the procedures were applied and conducted properly in the present instance.

*Id.* at 140, 828 P.2d at 1280–81. *See also id.* at 138–39 n. 5, 828 P.2d at 1280 n. 5 (citing other relevant factors from *United States v. Williams,* 583 F.2d 1194 (2d Cir.1978), *cert. denied,* 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979)). We also indicated that the trial court must determine "whether admitting such evidence will be more probative than prejudicial." *Id.; see also* HRE Rule 403 (1993).[13]

■ With respect to the relevancy prong, in the instant case, the prosecution was at-

---

(Emphasis added). The highlighted sentence above was added by amendment effective June 12, 1992. 1992 Haw.Sess.L.Act 191, § 2(7) at 410. The commentary to this rule initially explained that "[t]he traditional limitation to scientific, professional, or technical matters is *expanded to include 'other specialized knowledge' helpful to the trier of fact."* Commentary to HRE Rule 702 (1985). The 1992 amendment also "incorporate[d] a reliability factor[,]" thereby making it explicit that although "[g]eneral acceptance in the scientific community is highly probative of the reliability of a new technique[, it] ... should not be used as an exclusive threshold for admissibility determinations." Commentary to HRE Rule 702 (Supp.1992).

HRE Rule 703 provides:

**Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

12. In *Batangan,* we stated that:

although Dr. Bond's qualification as an expert was not objected to, his testimony regarding

general principles of social or behavioral science of a child victim in a sexual abuse case was *so miniscule,* we are convinced that his testimony *could not have assisted the jury* in understanding an otherwise bizarre behavior. In fact, Dr. Bond several times *asked the jury to recall their own childhood days and suggested that Complainant's actions were actions of normal children under similar circumstances.* When queried about retractions of accusations—a common behavior recognized as unique to intrafamily sex abuse—Dr. Bond admitted that he *lacked data* on the subject. Finally, when Dr. Bond was asked to evaluate Complainant's credibility in her accusation of sexual abuse by Defendant, he did not explicitly say that Complainant was "truthful" or "believable," but there is *no doubt in our minds that the jury was left with a clear indication of his conclusion that Complainant was truthful and believable.*

71 Haw. at 562–63, 799 P.2d at 54 (emphases added). In the instant case, Kriedman did not comment on the credibility of any witness.

13. HRE Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

tempting to introduce evidence to rebut Maelega's claim of extreme emotional disturbance. In *State v. Matias*, 74 Haw. 197, 840 P.2d 374 (1992), we held that "applicable case law leaves no doubt that the question of a killer's self-control, or lack of it, at the time of the killing is a significant, even determining, factor in deciding whether the killer was under the influence of an extreme emotional disturbance such that his conduct would fall under HRS § 707–702(2)." *Id.* at 204, 840 P.2d at 378. Therefore, we hold that Kriedman's testimony was relevant, specialized knowledge that would assist the jury in determining whether Maelega was under the influence of extreme emotional disturbance when he killed Eyvette.

■ We now turn to the reliability prong of the analysis. In *Montalbo*, we " 'adopt[ed]' the [*Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923)] test of general acceptance in the relevant scientific community under the reliability prong of the *Kim* analysis." *Montalbo*, 73 Haw. at 138, 828 P.2d at 1280. Maelega argues that the principle of "falsifiability" in *Daubert v. Merrell Dow Pharmaceuticals*, —— U.S. ——, ——, 113 S.Ct. 2786,·2796, 125 L.Ed.2d 469 (1993), has replaced the *Frye* test. In other words, Maelega suggests that because " '[s]cientific methodology today is based on generating hypotheses and testing them to see if they can be falsified[,]' " scientific evidence must be capable of empirical testing. *Daubert*, —— U.S. at —— – ——, 113 S.Ct. at 2796–97.

Although the *Daubert* Court expressly limited its holding to scientific knowledge, as opposed to technical or other specialized knowledge, *see id.* at —— n. 8, 113 S.Ct. at 2798 n. 8,[14] the Court essentially *incorporated* the *Frye* test as "an important factor" in determining whether expert testimony should be admitted at trial—the only material difference between the two tests being that *Daubert* apparently modified *Frye* to require "widespread" rather than "general"

acceptance. *Id.* at ——, 113 S.Ct. at 2797. Thus, *Daubert* effectuated the "liberal thrust" of the Federal Rules of Evidence by adopting a rule of law that reflects "their general approach of relaxing the barriers to 'opinion' testimony." *Id.* at ——, 113 S.Ct. at 2794.

Nevertheless, under HRE Rules 702 and 703, a trial court may disallow expert testimony if it concludes that the proffer of *specialized knowledge* is based on a mode of analysis that lacks trustworthiness. During voir dire, Kriedman indicated that she has been involved with domestic violence projects since the 1960s. For seven or eight years, she administered violence control programs for perpetrators and victims of domestic violence in Hawai'i, involving more than 500 men and over 750 women. Kriedman keeps current in the field of domestic violence by attending national meetings, reading relevant publications, obtaining professional training, and working with recognized leaders in the field. Kriedman also testified that domestic violence programs involve "extensive intake and history and corroboration of documentation of services used throughout the system or [Child & Protective Services] involvement or police reporting[.]" Accordingly, the circuit court qualified Kriedman as an expert in domestic violence over Maelega's objections and indicated that defense counsel would have the opportunity to challenge her testimony on cross-examination.

■ Applying the analysis in *Kim*, as qualified by *Batangan*, *see supra* note 12, we hold that the circuit court did not abuse its discretion in admitting Kriedman's expert testimony. During her testimony, Kriedman did not comment or otherwise offer her opinion on the credibility of any witness in this case.[15] *See, e.g., Batangan, supra; In re John Doe, Born November 23, 1970*, 70 Haw. 32, 40, 761 P.2d 299, 304 (1988); *State v. Castro*, 69 Haw. 633, 649, 756 P.2d 1033, 1044 (1988). As distinguished from the testimony of the expert witness in *Batangan*, Kried-

---

14. *See also Montalbo, supra* (involving expert testimony in the nature of scientific knowledge).

15. In fact, the circuit court specifically prohibited Kriedman from answering the prosecutor's

question as to her "opinion, to a reasonable degree of probability within [her] field, as to whether [Maelega] had self control at the time of the killing of Eyvette[.]"

man's testimony: 1) was not "so miniscule ... that it could not have assisted the jury in understanding an otherwise bizarre behavior"; 2) was not devoid of data or personal knowledge relevant to the "power and control wheel" theory; 3) did not invite the jury to consider matters outside the province of the trial; and 4) does not leave us with a clear indication that she communicated a belief to the jury that Maelega's claim of extreme emotional disturbance was not credible. *See Batangan*, 71 Haw. at 562–63, 799 P.2d at 54. In other words, Kriedman merely provided relevant specialized knowledge, unknown to the average juror, which would assist the jury in determining whether Maelega killed Eyvette while under the influence of an extreme emotional disturbance. *See Matias, supra.* Furthermore, we discern nothing from the record to indicate that the circuit court abused its discretion in determining that Kriedman's testimony would be more probative than prejudicial. *Cf. United States v. Rincon*, 28 F.3d 921, 925 (9th Cir.1994) (holding that expert testimony on the reliability of eyewitness identification was relevant, but confusing; therefore, the court addressed the issue in a comprehensive instruction).

### C.

■ Finally, Maelega contends that the circuit court erred in admitting evidence of certain prior bad acts because these acts were not similar to the instant offense and because they roused the jury to overmastering hostility.[16]

16. The evidence admitted at trial included testimony: 1) by Eyvette's mother that Eyvette told her Maelega had previously taken her to Kalihi Valley, beaten her, and threatened to kill her; 2) by Eyvette's mother that Maelega beat Eyvette almost every night when the two of them stayed with Eyvette's family; 3) by a medical social worker that Eyvette told her Maelega had been verbally abusive to her and would yell at her and hit her on occasion; 4) by the store manager where Eyvette worked that Maelega came into the store one day, found Eyvette in the freezer, pulled her out of the store, and threatened to break the store manager in half if he interfered; 5) by a nurse who attended Eyvette during her pregnancy that Maelega told the nurse that he "beat up" Eyvette in the labor and delivery room because it was okay for men to beat up their wives and children for obedience in Samoa; and

■ " 'Prior bad act evidence' is admissible when it is 1) relevant and 2) more probative than prejudicial." *State v. Robinson*, 79 Hawaiʻi 468, 471, 903 P.2d 1289, 1292 (1995) (citing *State v. Pinero [Pinero I ]*, 70 Haw. 509, 517–18, 778 P.2d 704, 710–11 (1989); HRE Rule 403, *supra* note 13; HRE Rule 404(b) (Supp.1994)).[17] In the instant case, the circuit court denied Maelega's motion *in limine* to preclude the introduction of evidence regarding certain prior bad acts based upon the following findings of fact and conclusions of law:

### FINDINGS OF FACT:

. . . .

2. This Court finds that the *strength* of the prior act evidence which the [prosecution] wishes to introduce *is great,* [Maelega] having already admitted to it by way of plea of guilty or by having been witnessed by more than one unbiased, third party witness.

3. This Court finds that there is little similarity between [Maelega's] prior acts and the instant offense as alleged in that the prior acts do not involve weapons, and do not involve strangulation or stabbing.

4. This Court finds that *very little time has elapsed between the prior act evidence and the instant offense charged,* most acts occurring within one month of the [Eyvette's] death.

5. This Court finds that there is a *great need for this evidence,* in that [Maelega] is alleging extreme mental or emotional dis-

6) by a clinical psychologist, who testified that when Eyvette was admitted for an attempted suicide she told the psychologist that she was afraid of Maelega and that there was a history of physical and emotional domestic abuse.

17. HRE Rule 404(b) provides in pertinent part:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

turbance based upon his relationship with [Eyvette]. Hence, that relationship may be scrutinized by the [prosecution] to disprove [Maelega's] alleged extreme mental or emotional disturbance.

6. This Court finds that the prior act evidence is *necessary* in that [Eyvette] is dead and cannot rebut [Maelega's] claims that [she] allegedly made statements to him regarding the state of their marriage and the paternity of the baby that she had delivered.

7. This Court finds that there is *no alternative proof* available to the [prosecution] on statements that [Eyvette] allegedly made to [Maelega] regarding the paternity of the child that she had just delivered.

8. This Court finds that the prior act evidence is *not of the nature which will rouse the jury to overmastering hostility.*

### CONCLUSIONS OF LAW:

1. The prior act evidence which the [prosecution] wishes to introduce is probative of other facts which are of consequence to the determination of the case, including, but not limited to, proof of motive, intent, plan, and to rebut the defense of extreme emotional disturbance. *State v. Pinero*, 70 Haw. 509, 778 P.2d 704 (1989).

2. The prior act evidence, if proved, rebuts both prongs of the extreme mental or emotional disturbance defense in that it may tend to show that [Maelega] acted with self-control at the time that he allegedly killed his wife, and secondly, it may tend to show that even if [Maelega] did not act with self-control, then there was no "reasonable explanation" for his extreme mental or emotional disturbance.

3. This court has weighed the probative value of the prior act evidence and finds that its probative value far outweighs any danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

(Emphases added.) We hold that the circuit court applied the appropriate analysis, *see Robinson*, 79 Hawai'i at 471–72, 903 P.2d at

1292–93 (explicating *Pinero I, supra*), and did not abuse its discretion in admitting evidence of Maelega's prior bad acts.

### IV. CONCLUSION

For the reasons discussed in section III.A., *supra,* we reverse and remand for a new trial.

NAKAYAMA, Justice, concurring and dissenting.

I concur in the majority opinion except as to part III.A. Because I believe that the trial court did not improperly instruct the jury, I dissent from part III.A and, therefore, would affirm the conviction of defendant-appellant Muao Maelega (Maelega).

Because our case law entitles a defendant to a jury instruction based "on every defense or theory of defense having any support in the evidence," *State v. Pinero*, 75 Haw. 282, 304, 859 P.2d 1369, 1379 (1993) (cited in Majority at 178–79, 763–64 of 907 P.2d), I agree with the majority's holding that it was not inappropriate for the circuit court to issue to the jury an extreme mental or emotional disturbance (EMED) instruction.

However, I disagree with the majority's holding that the EMED instruction given by the trial court was prejudicially erroneous and misleading. Majority at 179, 764 of 907 P.2d. Throughout its instructions to the jury, the trial court repeatedly admonished the jury that the prosecution had the burden of proving every material element of the offense charged against the defendant beyond a reasonable doubt. The trial court also directed the jury that it must presume that the defendant is innocent of the charge against him, and that the presumption remains throughout the trial, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.

Although not quoted in the majority opinion, just prior to the instruction that the majority scrutinized, the trial court instructed the jury that:

If and only if you find beyond a reasonable doubt that the defendant intentionally or knowingly caused the death of [his

wife], you must then determine whether at that time the defendant was under the influence of extreme mental or emotional disturbance *for which there is a reasonable explanation.* The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances of which the defendant was aware or as the defendant believed them to be.

The prosecution must prove beyond a reasonable doubt that the defendant was not at the time he caused the death of [his wife] under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. If the prosecution has done so, then you must return a verdict of guilty of murder in the second degree. If the prosecution has not done so, then you must return a verdict of guilty of manslaughter based on extreme mental or emotional disturbance.

(Emphasis added.) *See* Hawai'i Revised Statutes (HRS) § 707–702(2) (1993).[1] Thus, the jury was properly instructed that, if it found that Maelega intentionally caused the death of his wife, the jury should then consider whether Maelega did so under the influence of an extreme mental or emotional disturbance *for which there is a reasonable explanation.* The prosecution had the burden of proving beyond a reasonable doubt that Maelega was not under the influence of an extreme mental or emotional disturbance.

In determining whether there was a reasonable explanation from the evidence to find that Maelega was under the influence of an extreme mental or emotional disturbance, the jury would weigh the credibility of the evidence. If the jury found that the evidence showing that Maelega manifested an extreme mental or emotional disturbance was not credible, then, obviously, there could not have been a reasonable explanation that Maelega was under the influence of an extreme mental or emotional disturbance and the

prosecution would have impliedly carried its burden of disproving that Maelega acted under the influence of an extreme mental and emotional disturbance. Therefore, because common sense tells us that evidence of EMED must be credible in order to sustain a conviction, as the scrutinized instruction so indicates, I would hold that the instruction was correct.

If an EMED instruction is given by the circuit court, the jury is not to presume that the defendant is guilty of manslaughter as a result of an extreme mental or emotional disturbance. The majority opines that, "[b]y giving the EMED instruction to the jury, the circuit court implicitly acknowledged that a reasonable juror could rely on the record evidence to determine that Maelega acted while under an extreme [mental or] emotional disturbance when he killed Eyvette" Majority at 177, 762 of 907 P.2d. I agree that the jury could rely on the record evidence to determine *whether* Maelega acted while under the influence of an extreme mental or emotional disturbance; however, in making this determination, the jury must weigh the evidence to determine whether there is a reasonable explanation to support the EMED defense. It only follows that a "reasonable explanation" comes from *credible* evidence.

The circuit court determines the appropriateness of an EMED instruction based on whether there is *any* evidence in the record to support this contention. *Pinero,* 75 Haw. at 304, 859 P.2d at 1379. If there is any evidence, then the circuit court should instruct the jury as to an EMED defense. By giving this instruction, however, the circuit court is not determining whether the evidence was credible. Rather, weighing the credibility of evidence is left to the factfinder, in this case the jury, not the bench. Therefore, in determining whether there was a reasonable explanation to support an EMED defense, the jury, not the trial judge, would make this determination based on

---

1. HRS § 707–702(2) (1993) provides:

In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he [or she] caused the death of the other person, under the influence of extreme mental or emotional disturbance *for*

which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he [or she] believed them to be.
(Emphasis added.)

credible evidence. Thus, the mere giving of an EMED instruction does not have any implicit bearing on the credibility of the evidence.

The majority is stretching the possible interpretations of the scrutinized instruction by guessing at what the jury *could have* implied from what is clearly *not* an incorrect statement of the law. It is insulting to the members of the jury on this case to, in effect, tell them that they received an instruction that was not technically incorrect, but there is a possibility that they weren't intelligent enough to understand what it really meant.

The majority makes the all too common mistake of underestimating the intelligence of the jury. The jury who sat on this case listened to all of the evidence, listened to the instructions, and the closing arguments where both the prosecution and the defense repeatedly admonished the jury that the prosecution has the burden of proving be-

yond a reasonable doubt that Maelega was not under the influence of an extreme mental or emotional disturbance, and apparently came to the conclusion that it is not reasonable for a man to kill his wife because he suspects infidelity. In this case, where the old way of thinking of women as chattel met head-on with the present day acknowledgment of women as having the right to personal autonomy, there was no error committed by the trial judge and the conviction should stand. Accordingly, I dissent from the majority opinion and would affirm Maelega's conviction.