Electronically Filed
Intermediate Court of Appeals
CAAP-18-0000437
18-JAN-2022
07:57 AM
Dkt. 113 MO

NO. CAAP-18-0000437

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

STATE OF HAWAI'I, Plaintiff-Appellee,
v.
FRED SILVA, III, Defendant-Appellant

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 1PC151000197)

MEMORANDUM OPINION
(By: Ginoza, Chief Judge and Wadsworth, J., with
Hiraoka, J., concurring in part and dissenting in part)

Defendant-Appellant Fred Silva III (**Silva**) appeals from the Judgment of Conviction and Sentence entered on May 3, 2018, by the Circuit Court of the First Circuit (**Circuit Court**).[1] Silva was convicted of Murder in the Second Degree for the stabbing death of a woman with whom he had a relationship.

On appeal, Silva contends the Circuit Court erred by: not investigating an issue raised by a juror; determining evidence of Silva's prior bad acts was admissible; ruling rebuttal testimony from a forensic-pathology expert was admissible and within the scope of the expert's expertise; and not *sua sponte* striking or giving a limiting instruction regarding testimony elicited by defense counsel and objected to by the State, where the court sustained the State's objection.

---

[1] The Honorable Karen T. Nakasone presided.

Silva further contends on appeal that his trial counsel was ineffective for eliciting testimony from Silva that he smoked methamphetamine and is a hypocrite.

We reject Silva's asserted points of error and we affirm his conviction.

## I.  Background

The State of Hawai'i (**State**) contends in this case that, on the morning of February 4, 2015, at an encampment at the Tracks Beach Park (**Tracks campsite**), Silva intentionally stabbed Calvine "Lei" Nakatani (**Nakatani**) in the back, causing her to bleed to death.  The State presented the testimony of the following: Karyn Hoshino (**Hoshino**), who says she witnessed Silva stab Nakatani; two emergency medical technicians (**EMTs**) who both responded to the scene and who testified that Nakatani told them Silva stabbed her, with one of the EMTs testifying Nakatani told her Silva would not let Nakatani call for help; and Dr. Christopher Happy (**Dr. Happy**), the Chief Medical Examiner for the City and County of Honolulu, who opined Nakatani died from a stab wound.  The State contends Silva intended to stab Nakatani in the back because he was upset she had not returned to his tent after staying out all night.

Silva, testifying in his own defense, testified he was in a relationship with Nakatani, admitted that it was a "rocky" relationship, but denied intentionally stabbing her.  Instead, Silva contends that, as he held a knife against Nakatani's back, she stood up and then fell back into a chair unconscious.  Silva contends he failed to realize the knife had penetrated Nakatani because he believed Nakatani had fallen unconscious due to her poor health conditions and possibly being scared by the knife at her back.

Following a five-day trial, a jury convicted Silva of Murder in the Second Degree.

## II.  Standard of Review

### A.  Plain Error

Under Hawai'i Rules of Penal Procedure (**HRPP**) Rule 52(b), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."  Where substantial rights are not affected, however, "[a]ny error, defect, irregularity or variance . . . shall be disregarded [as harmless]."  HRPP Rule 52(a).

### B.  Admissibility Of Evidence Generally

"The admissibility of evidence requires different standards of review depending on the particular rule of evidence at issue."  State v. Cordeiro, 99 Hawai'i 390, 403-04, 56 P.3d 692, 705-06 (2002) (citation omitted).

> When application of a particular evidentiary rule can yield only one correct result, the proper standard for appellate review is the right/wrong standard. However, the traditional abuse of discretion standard should be applied in the case of those rules of evidence that require a "judgment call" on the part of the trial court.

Id. at 404, 56 P.3d at 706 (quoting State v. Pulse, 83 Hawai'i 229, 246-47, 925 P.2d 797, 814-15, as amended on reconsideration in part, 83 Hawai'i 545, 928 P.2d 39 (1996)).

### C.  Prior Bad Acts

"[A] trial court's balancing of the probative value of prior bad act evidence against the prejudicial effect of such evidence under HRE Rule 403 [] is reviewed for abuse of discretion."  State v. Gallagher, 146 Hawai'i 462, 470, 463 P.3d 1119, 1127 (2020) (first alteration in original) (quoting Cordeiro, 99 Hawai'i at 404, 56 P.3d at 706.

### D.  Expert Testimony

"[T]he general rule is that admissibility of expert testimony is a matter within the broad discretion of the trial judge, [whose] decision will not be overturned on appeal unless manifestly erroneous or clearly an abuse of discretion."  State v. Matias, 74 Haw. 197, 203, 840 P.2d 374, 377 (1992) (first alteration in original) (quoting State v. Murphy, 59 Haw. 1, 14, 575 P.2d 448, 457 (1978)).

3

E.    Rebuttal Testimony

"[The Hawai'i Supreme Court] has declared that '[t]he introduction of evidence in rebuttal and in surrebuttal is a matter within the discretion of the trial court and appellate courts will not interfere absent abuse thereof.'" State v. Duncan, 101 Hawai'i 269, 274, 67 P.3d 768, 773 (2003) (quoting Takayama v. Kaiser Foundation Hosp., 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996)) (second alteration in original).

F.    Infective Assistance of Counsel

> When the denial of the right to effective assistance of counsel is raised, the question is: "When viewed as a whole, [was] the assistance provided [to the defendant] 'within the range of competence demanded of attorneys in criminal cases[?]'" State v. Smith, 68 Haw. 304, 309, 712 P.2d 496, 500 (1986) (citations omitted). The defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

State v. Aplaca, 74 Haw. 54, 66-67, 837 P.2d 1298, 1305 (1992) (emphasis added).

III.    Discussion

A.    The Circuit Court Did Not Commit Plain Error Regarding An Unspecified Jury Issue To Which The Defense Did Not Object

Silva argues for the first time on appeal that the Circuit Court should have sua sponte inquired into the possible prejudicial nature of unspecified papers a juror or jurors apparently sought to present to the court in the beginning stages of the trial. After the jury was empaneled but before opening statements were presented, the Circuit Court addressed the jury:

> And I wanted to say another thing. We went through two and a half days of jury selection to get to the process where we have our jury and three alternates. So all of you were not excused, all of you were not deferred, and I believe someone, at least one of you have papers to present to me. I'm not going to look at it because it is too late to give me any papers to try to get excused from the jury. We went through two and a half days of jury selection with over a hundred jurors to get to this point so we need to get the trial started and underway.

4

(emphasis added).  Silva did not object to the Circuit Court's refusal to review the papers.  The record does not indicate which juror or jurors attempted to present papers to the court, nor does it contain a copy of the papers the juror or jurors attempted to raise with the court.

While the right to a "fair trial by an impartial jury is guaranteed" by the federal and state constitutions, State v. Williamson, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991) (juror misconduct not harmless where defendant requested and was denied further investigation into dictionary found in jury room after judge had previously denied request for dictionary to look up terms in jury instructions), "[t]he defendant bears the initial burden of making a prima facie showing of a deprivation that 'could substantially prejudice [his or her] right to a fair trial' by an impartial jury."  State v. Furutani, 76 Hawai'i 172, 181, 873 P.2d 51, 60 (1994) (second alteration in original) (first citation omitted) (citing Lopez v. State, 527 N.E.2d 1119, 1130 (Ind. 1988) ("A defendant seeking a hearing on juror misconduct must first present some specific, substantial evidence showing a juror was possibly biased.")).

Although the right to an impartial jury is fundamental to the judicial system, Silva failed to raise any objection in the Circuit Court and did not advance a prima facie case that his right to an impartial jury would be violated by outside influences if the unspecified papers were not reviewed.  Id.  He made no attempt at trial to establish any grounds for possible prejudice if the court did not, at minimum, investigate the papers.  Moreover, "[o]ne important mechanism for ensuring impartiality is voir dire, which enables the parties to probe potential jurors for prejudice."  United States v. Kechedzian, 902 F.3d 1023, 1027 (9th Cir. 2018) (citation omitted).  Here, the trial court noted there had been "two and a half days of jury selection with over a hundred jurors[.]"  The defense thus had ample opportunity to address and raise any juror prejudice.

5

Given this record, we conclude there was no plain error by the Circuit Court.

**B.  The Circuit Court Did Not Err by Admitting Evidence of Silva's Prior Bad Acts**

**1.  Relevance of Prior Bad Acts**

Silva contends the Circuit Court should not have admitted evidence about his prior bad acts toward Nakatani because they only serve to demonstrate his propensity to stab her.  The subject evidence consists of testimony from Nakatani's friend of 10 years, Hoshino, that approximately three months before Silva stabbed Nakatani, he told Hoshino "I can kill her. If I can't have her, no one can."  Hoshino testified that Nakatani and Silva's relationship was "rocky," Silva was very possessive of Nakatani, and the last few months of their relationship was "off and on" and Nakatani was "trying to make it off."

Hoshino also testified to seeing Nakatani with a black eye approximately three months before Nakatani's death and that Nakatani told her the injury was from Silva.  Additionally, Nakatani's son, Davin Kaipo Nakatani (**Kaipo**), testified that a few months before she passed away he saw Nakatani with a black eye and that both Nakatani and Silva told Kaipo it was from Silva.

Although Silva denied threatening to kill Nakatani or saying "if I can't have you, no one can[,]" he testified he was "[a] little" possessive of Nakatani, and that he gave Nakatani a black eye in the past because she would periodically disappear, which "broke [his] heart" and upset him.  Silva described his relationship with Nakatani on the day of the incident as "[a] little rocky" because of his concern for Nakatani's health.  In particular, Silva testified that he believed lesions Nakatani had started developing on her body were related to her methamphetamine use and that her using the drug was not good for her high blood pressure.

6

He also testified that the night before the incident, he and Nakatani had smoked "ice" at a neighboring tent, he expected her to come back to his tent site to help clean up because they talked about it, and he left the neighboring tent because he did not like Nakatani smoking "ice."  On the morning of the incident, Silva testified he was "depressed" that Nakatani had not come back to their tent, and he was irritated from the effects of using ice the night before.

Silva testified he went back to the neighboring tent that morning, drew his knife from its sheath as he entered the tent because people were there that he did not know and he was afraid the tent's owner might hit him with a hammer, and he found Nakatani seated on a chair in the neighbor's tent.  Silva told Nakatani, "Come on, let's go," to which she did not respond.  As Nakatani remained seated with her back towards Silva, he testified that he pressed the flat part of the double-edged knife against her back, by her left shoulder, for "dramatic" effect because he was afraid of the people that were around, and again said, "Come on, let's go" to get her to come back to his campsite and to prod her to get up.  Nakatani then stood up and Silva followed her with the knife still on her body to "prod her" or "gode her" to get up.  Silva testified that, after Nakatani stood up: "then everything happened so fast I never know what was wrong until she flop back in the chair unconscious.  I thought I scared her into a heart attack or a stroke."  Silva testified he did not know the knife had penetrated Nakatani's skin.  Silva testified that after Nakatani flopped back down on the chair she was unconscious, he could not lift her so he overturned the chair and she rolled out of the chair to the ground, and he started CPR.  Silva testified that while Nakatani was on the ground he noticed a wound on her back but thought it was from shells.  He further testified that, after giving Nakatani CPR, she regained consciousness and he was trying to sit her up when police arrived and he was told to leave the tent.  Silva last saw Nakatani as she was brought out of the tent on a gurney and she was alive.

7

He later learned at the police cellblock that she had passed away.

During cross-examination, Silva testified that on the morning of the incident, Nakatani was wearing a tank top with a lot of her skin exposed and he could tell that when he pressed the metal knife to her back she could feel it on her. He also testified that he was upset and mad at Nakatani that morning because she had not come back to his tent, she was "hanging out" at the neighbor's tent, she was using meth, and she would not come home. When asked if he had beat Nakatani in the past, he testified that he would not call it a beating but she ended up with a black eye that he had given her, but that he had cuts, bruises and was hit too. Silva further acknowledged that he would get mad at Nakatani because she would disappear on him, but he was used to it already, and that on the day of the incident he was "really frustrated" because she had not come back to his tent to help clean up, as he expected and wanted her to do.

The State contends the prior incident of Silva giving Nakatani a black eye was properly admitted as probative of Silva's motive, intent, or absence of mistake or accident in stabbing Nakatani when he once again discovered and became upset that she was missing on the morning of the incident. The State does not address Hoshino's testimony about Silva's threat to kill Nakatani, but we note Silva did not raise this evidence in his points of error, only briefly in his argument section. Nonetheless, we will address both the evidence of prior abuse and the evidence of the threat.

The challenged evidence is admissible under Hawai'i Rules of Evidence (**HRE**) Rule 404(b)[2] if offered for "substantive

---

[2] HRE Rule 404(b) states, in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus

(continued...)

reasons rather than propensity[.]" State v. Behrendt, 124 Hawai'i 90, 103, 237 P.3d 1156, 1169 (2010) (citation omitted). Here, we conclude that given the record in this case, the evidence that Silva threatened to kill Nakatani and said "If I can't have her, no one can," and that he previously gave Nakatani a black eye while upset that she had disappeared, are relevant to Silva's intent, motive, or absence of mistake or accident in regard to the current subject incident. Based on the testimony of the State's witnesses, the State contends that Silva intentionally stabbed Nakatani. Silva, on the other hand, claims Nakatani fell back after she stood up and he did not know the knife had penetrated her skin. Given the full record, including Hoshino's testimony that Nakatani had been trying to make her relationship with Silva "off," the uncontested evidence that Nakatani did not return to Silva's tent the night before the incident, Silva's testimony that he previously got upset at Nakatani for disappearing and had given her a black eye, and his testimony that he was depressed and "really frustrated" the morning of the stabbing incident because Nakatani had not returned to their tent, the challenged evidence is relevant to Silva's intent, motive, or absence of mistake or accident in regard to the stabbing incident.

### 2. Balancing the Probative Value of Prior Bad Acts

Silva further contends evidence of the prior bad acts is weak and unrelated to the incident at issue, and thus unfairly prejudicial. Even if relevant, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." HRE Rule 403 (emphasis added). Under this test, the following factors are balanced:

---

[2](...continued)
operandi, or absence of mistake or accident.

> (1) the strength of the evidence as to the commission of the other crime, (2) the similarities between the crimes, (3) the interval of time that has elapsed between the crimes, (4) the need for the evidence, (5) the efficacy of alternative proof, and (6) the degree to which the evidence probably will rouse the jury to overmastering hostility.

State v. Feliciano, 149 Hawai'i 365, 376-77, 489 P.3d 1277, 1288-89 (2021) (brackets omitted) (quoting Gallagher, 146 Hawai'i at 470, 463 P.3d at 1127) (holding that evidence of bad act — defendant pushing wife out of chair — was improperly admitted, where such evidence was not probative of any pertinent issue regarding the subject incident of punching wife's face, and because even if there was any probative value it was substantially outweighed by its potential for unfair prejudice). Courts must give due consideration to all these factors, especially in light of the "justifiable stigma attached to domestic abusers in the eyes of the public[.]" Feliciano, 149 Hawai'i at 377, 489 P.3d at 1289 (quoting State v. Lavoie, 145 Hawai'i 409, 414-416, 418-19, 426, 453 P.3d 229, 234-236, 238-39, 246 (2019), as corrected (Dec. 2, 2019) (prior bad acts held not admissible where defendant shot and killed girlfriend following separation because prior abuse deemed to have little probative value as to the shooting, the prior incidents occurred between eight or ten months to six years before the shooting, and even if there was slight relevance to extreme mental or emotional distress defense it was substantially outweighed by the danger of unfair prejudice); see also State v. Maelega, 80 Hawai'i 172, 183-84, 907 P.2d 758, 769-70 (1995) (prior spousal abuse admissible where evidence was strong (admitted by defendant or witnessed by unbiased third-parties), little time had elapsed between prior acts and incident (most acts within one-month span of victim's death), spouse died and could not rebut claims by defendant regarding relationship).

Here, the probative value of Silva's prior bad acts is not outweighed by any prejudicial effect. First, Hoshino testified about Silva's threat to kill Nakatani, although Silva denied making the statement. Though this evidence is disputed,

10

Hoshino testified to being a close friend of Nakatani and knew her well, and her testimony was fairly strong. With regard to the prior abuse, Hoshino and Kaipo testified that Nakatani told them about getting a black eye from Silva, and moreover Silva himself admitted to giving Nakatani a black eye, which weighs against exclusion. See Gallagher, 146 Hawai'i at 470, 463 P.3d at 1127 ("Because [defendant] does not deny that the prior incidents occurred and submitted no contrary evidence, the first factor does not weigh against admittance.").

Further, the stabbing incident was substantially similar to the prior incidents in that the prior incidents involved Silva being possessive over Nakatani and making a threat or acting out related to his possessiveness, and for the stabbing incident Silva testified to being upset that Nakatani had not returned to their campsite when he woke up. Hoshino testified that Silva was very possessive of Nakatani, that Nakatani was trying to "off" her relationship with Silva, and that he had made the threat against Nakatani and said "If I can't have her no one can." Further, Silva testified to giving Nakatani a black eye previously because she would periodically disappear, which upset him. The prior bad act evidence in this case differs from the inadmissible evidence in Feliciano and Lavoie, where the supreme court indicated the prior acts and incidents at issue were not sufficiently similar merely because both were acts of domestic abuse directed toward the victims. See Feliciano, 149 Hawai'i at 377, 489 P.3d at 1289 ("Here, the alleged 'volitional activity' was the alleged punch. The ICA majority did not specify how the chair incident led to Feliciano's motivation for the alleged volitional activity.").

Regarding the interval between incidents, Silva made the threat against Nakatani, and gave Nakatani a black eye, approximately three months prior to the stabbing, which is closer in time to the acts held admissible in Maelaga than the inadmissible acts in Lavoie (eight to ten months before incident) and Feliciano (eleven months prior to incident).

To avoid a prohibited inference that a short interval between incidents may "increase the likelihood that a jury will . . . conclude that the defendant has a propensity for committing such acts," the evidence must be "offered for a purpose for which similarity in time and nature is probative" to weigh in favor of admissibility. Gallagher, 146 Hawai'i at 472, 463 P.3d at 1129. In this case, the prior bad act evidence was probative of Silva's intent to injure Nakatani out of anger over her disappearing. Moreover, there were limited and unrelated "surrounding details of the [prior] incidents" that would outweigh the probative value of prior acts. See id. (testimony of prior bad acts excluded for "extensive surrounding details of the incidents" that were "highly prejudicial" and "had no bearing on [] issue").

The evidence is relevant to Silva's intent, motive, or absence of mistake or accident to hurt Nakatani, instead of his contention of placing the knife at her back purely for "dramatic" effect. See Maelega, 80 Hawai'i at 184, 907 P.2d at 770. Here, the prior abuse would rebut Silva's claims that he was a little possessive and his relationship with Nakatani was "[a] little rocky" only because of his concern over the effects of methamphetamine on her health. This is especially critical considering, unlike in Feliciano, the victim is no longer alive to rebut any testimony by the accused about the nature of the relationship. Moreover, the prior act evidence is needed because of the limited alternative evidence that Silva had the motive or intent to hurt Nakatani.

As to the last factor, Silva argues that because a black eye is primarily intended to inflict fear and pain, while killing, although "callous and terrible," does not serve the same primary goal, a black eye is far more "incendiary" and the risk of prejudice outweighs the probative value of admitting the prior act. However, considering Silva stated the purpose for putting the knife on Nakatani's back was "[f]or her to get up and leave with [him,]" implying that he intended to engender fear and discomfort with the threat of pain for not complying, which is a

12

similar reaction Silva argues a black eye intends to elicit, admitting the prior act as evidence would not likely rouse the jury to a high degree of overmastering hostility towards Silva. Balancing all these factors, the probative value of the evidence outweighs any prejudicial effect and the Circuit Court did not abuse its discretion by admitting the prior acts. See Maelega, 80 Hawai'i at 184, 907 P.2d at 770.

C. **Dr. Happy's Rebuttal Testimony Was Properly Admitted**

1. **Dr. Happy's Rebuttal Testimony Was Not Cumulative**

On appeal, Silva argues the Circuit Court abused its discretion by allowing Dr. Happy to provide cumulative testimony on rebuttal. On direct-examination Dr. Happy testified, *inter alia*, to the path and pressure of the knife that lead to Nakatani's stab wound. Dr. Happy explained that while it is not possible to discern the pressure required to cause a particular stab wound, "the hardest part is to get through the skin and the underlying soft tissue, the underlying connective tissue of an individual. That's the portion that's most dense." He then opined that the cause of Nakatani's death was the stab wound of the torso that perforated her heart, and her medical conditions were not a cause of her death.

On cross-examination, Dr. Happy testified about the easiest path to stab one in the heart, and later regarding hypothetical reactions to a knife at one's back. Dr. Happy explained that because the knife used to stab Nakatani appeared to be "blunted" and not "very sharp," while it would be possible for someone to "still go into the knife" if felt against the skin and held "steady," the natural reaction would be to "go away from the pain."

Silva testified on direct-examination he did not know the knife had penetrated Nakatani at any point, believing instead he had scared her into having a heart attack or stroke due to her high blood pressure, which caused her to fall back unconscious. On cross-examination, Silva stated he did not feel the knife

13

pierce Nakatani's skin because he was "following her with the knife" as she stood up.

Upon an offer of proof, the Circuit Court allowed the State to bring Dr. Happy back as a witness to rebut Silva's version of the incident. Dr. Happy then testified that the "natural reflection to the stimulus of pain is to pull away" as is the case of a knife causing pain at one's back. The State then described a scenario based on Silva's direct-examination, in which Silva is "standing to [Nakatani's] right and with his right hand is holding the flat part of this type of -- of this knife to her back" and asked, "[w]ould you expect the knife to penetrate her 11 inches, severing her heart under that scenario?" Dr. Happy explained that because the knife used to stab Nakatani was "not a heavy knife [] the person holding the knife would have to hold [it] steady and not move [it] back." He also added:

> There are several things you could do if somebody was moving relative to your knife and you wanted to not stab them. One is you could drop the knife. Two is you could move the knife back . . . . But if you held the knife in place and you kept it there and didn't move it, the person could theoretically impale themselves on the knife.

As noted above, evidence may be excluded as cumulative under HRE Rule 403. "In order for evidence to be considered 'cumulative' for HRE 403 purposes, it must be substantially the same as other evidence that has already been received." Pulse, 83 Hawai'i at 247, 925 P.2d at 815 (citations omitted); see also, Tabieros v. Clark Equip. Co., 85 Hawai'i 336, 394, 944 P.2d 1279, 1337 (1997). In other words, unless the testimony is "unnecessarily duplicative or prejudicial" it can be admitted. Tabieros, 85 Hawai'i at 394, 944 P.2d at 1337. Here, Dr. Happy's testimony during rebuttal differed from his testimony in the State's case-in-chief in that it further detailed a hypothetical concerning the factors required to stab someone in the left back with a weapon, such as Silva's knife, being held in an accused's right hand as well as steps an accused could have taken to avoid a stabbing. The Circuit Court did not abuse its discretion in allowing Dr. Happy's rebuttal testimony.

14

## 2. Dr. Happy's Testimony Was Not Beyond the Scope of His Expertise

Silva further claims the Circuit Court violated HRE Rule 702[3] because Dr. Happy was not qualified to testify on rebuttal regarding one's reflexes in response to pain and the amount of pressure to be applied to a knife that would cause an injury comparable to Nakatani's. In State v. Metcalfe, 129 Hawai'i 206, 297 P.3d 1062 (2013), the Hawai'i Supreme Court held testimony from a forensic pathologist, that a victim's cause of death was "a shotgun injury to the back at a distance of approximately 60 feet[,]" was admissible where the expert was "a trained, licensed, and certified forensic pathologist," trained in ballistic and firearm related autopsy, and explained the formula used to calculate his opinion. Id. at 227-29, 297 P.3d at 1083-85.[4] Similarly, in State v. Allen, No. 30332, 2013 WL 5926964, at *10 (Haw. App. Oct. 31, 2013) (mem.), this court rejected the defendant's argument that an expert witness was not qualified to testify regarding the victim's "wounds being consistent with 'defensive wounds'" because the witness, although highly qualified, was not certified in forensic pathology.[5]

---

[3] HRE Rule 702 provides, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

(emphasis added).

[4] In that case the expert witness was "the coroner's physician for the County of Maui, Hawai'i County and the County of Kaua'i; [] a physician and surgeon licensed in the State of Hawai'i; [] certified by the American Board of Pathology in anatomic and clinical pathology and forensic pathology; [] performed over 3,000 autopsies; [] observed in excess of a hundred cases in which the cause of death was injury caused by a firearm; [] received ballistics training with the Maryland State Crime Lab; and [] had autopsy training with respect to death due to firearms." Metcalfe, 129 Hawai'i at 227, 297 P.3d at 1083.

[5] There, the witness was the Acting Chief Medical Examiner of the City and County of Honolulu, licensed to practice medicine in Hawai'i for over

(continued...)

15

In his testimony, Dr. Happy explained that an autopsy consists of "an external and internal examination of a body after death to determine [] the cause of the death [] and [the] manner of the death [] for death certificate purposes" followed by a report compiling the examiners findings. Dr. Happy further explained that forensic pathologists review "both the medical record for the injury or illness leading up to death and also older ones" associated with the victim as well as police reports, when appropriate. He also noted that he looks at reports generated by "medical-legal investigators [from his department] who go out to scenes of death and document what they see and collect information about the circumstances surrounding the death" before conducting the autopsy.

Here, Dr. Happy has extensive experience to testify about natural human reflexes and the pressure needed to cause Nakatani's injury with Silva's knife. Besides being the Chief Medical Examiner for the City and County of Honolulu, Dr. Happy is licensed to practice medicine in Hawai'i, certified in anatomic and forensic pathology by the American Board of Pathology, does yearly medical education courses to maintain his license, has conducted about 3,000 autopsies, and has testified as an expert witness in forensic and anatomic pathology in multiple states, including Hawai'i.

Silva argues Dr. Happy has no expertise in crime-scene forensics, pain responses, or death investigations, which are "different crime-scene investigatory roles" than that of a forensic and anatomical pathologist "who is [typically a medical examiner] responsible solely for the autopsy portion of the

---

[5](...continued)
forty years, completed a residency in anatomic pathology, and was "board certified in anatomic pathology (of which forensic pathology is a sub-speciality) by the American Board of Pathology." Allen, 2013 WL 5926964, at *10 (mem. op.). Additionally, the expert witness testified that "he had conducted approximately 1,600 forensic autopsies and had previously been qualified to testify as a medical expert in forensic pathology in the Hawai'i state courts on about 80 previous occasions over the past eight and a half years." Id.

16

investigation[.]"  Quoting Joseph Prahlow, Forensic Pathology for Police, Death Investigators, Attorneys, and Forensic Scientists, 2010, at 17, 52-53.  This argument, however, ignores the main purposes of an autopsy: to determine the manner of death, which may entail considering internal and external observations of the body to reasonably infer situational factors that explain the cause of injury or death.

Although Silva points to the specific role of a medical examiner according to relevant literature, he fails to provide any sources stating medical examiners cannot make reasonable inferences regarding the circumstances surrounding death to determine its cause.  Nor does he acknowledge Hawai'i case law allowing experts "to testify as to specific matters falling under the scope of their expertise."  See  Allen, 2013 WL 5926964, at *11 (mem.) (citing Larsen v. State Sav. & Loan Ass'n, 64 Haw. 302, 305, 640 P.2d 286, 289 (1982)).  As a medical doctor, understanding natural human reactions as well as injury causes is within the scope of Dr. Happy's expertise.  Moreover, because determining whether Silva intentionally stabbed Nakatani or Nakatani unconsciously impaled herself into the knife pertains to her manner of death, it is within the realm of forensic pathology, and therefore falls within the scope of Dr. Happy's expertise.  Id.  Accordingly, Dr. Happy was qualified to testify about natural human reactions to pain and the factors to consider in Nakatani's injury.

D.    **The Circuit Court Did Not Err by Failing to Strike or Limit Testimony in Response to a Sustained Objection**

Next, Silva contends it was plain error for the Circuit Court not to sua sponte strike his own testimony from the record or to issue a curative instruction to the jury because the testimony "negatively affected [Silva's] credibility."  On direct examination, Silva testified as follows:

[DEFENSE COUNSEL]: Okay. Now, you didn't want Lei to be smoking ice but she smoked ice with you that night?
[SILVA]: Yeah, think so.
Q: Okay. How did you feel about that?
A: I couldn't do nothing. She going do what she like to do.
Q: And you made it clear to her how you felt?
A: Yeah.

Q: And -- and you could see how it's kind of hypocritical of
you saying that, right, because you smoking it?
A: Yeah.
Q: Object. Leading, your honor.
The Court: Sustained. Rephrase.

Although the State made an objection to defense counsel's question that was sustained, defense counsel failed to make a motion to strike the question and answer from the record. Cf. State v. Hashimoto, 46 Haw. 183, 195, 377 P.2d 728, 736 (1962) ("When an unresponsive or improper answer is given . . . the remedy is a motion to strike. Absent such motion, the answer will generally not be considered when urged on appeal as prejudicial.") (citation omitted). Thus, Silva waived any argument that his subject testimony should have been stricken. Moreover, the State's objection pertained to the leading nature of defense counsel's question, not substantively to the content of the testimony as prejudicial. Therefore, all other grounds for objection besides leading were waived. See State v. Alston, No. 28410, 2009 WL 868034, at *16 n.13 (Haw. App. Mar. 31, 2009) (mem.) ("As a general rule, objecting on a specific ground waives all other grounds for objection.") (citing State v. Vliet, 91 Hawai'i 288, 299, 983 P.2d 189, 200 (1999)).

E.   **Silva's Trial Counsel Was Not Ineffective**

Lastly, Silva claims ineffective assistance of counsel because defense counsel "elicited damaging testimony" and "severely hurt [Silva]'s credibility before the jury" by getting Silva to admit he smoked methamphetamine and is a hypocrite. Importantly, "[s]pecific actions or omissions that are alleged to be erroneous but that had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." State v. Salavea, 147 Hawai'i 564, 576, 465 P.3d 1011, 1023 (2020) (citing omitted).

In review of the whole record, we reject Silva's assertion of ineffective assistance of counsel. First, Silva's testimony that he used methamphetamine had a tactical advantage of casting him in a sympathetic light for the jury by demonstrating he cared about Nakatani's health conditions perhaps more than his own. Further, it arguably was a way to establish

18

Silva's credibility because he tacitly admitted to using methamphetamine when justifying the reason he took his knife to the tent to retrieve Nakatani:

```
Q.      Did you think you needed protection?
A.      Yeah.
Q.      From whom?
A.      From everybody.
Q.      Why?
A.      Because the homeless is -- it can be dangerous and I was --
I was scared.  Paranoid already.
Q.      [D]id it also apply to the homeless people in that specific
campsite that you were living in?
A.      Yeah, 'cause they -- all kind different people come and go.
Q.      And were some of the people in the homeless community on
meth?
A.      Yeah, everyone.
```

Based on the tactical basis for raising Silva's methamphetamine use, defense counsel's competence should not be further scrutinized on the issue.  Salavea, 147 Hawaiʻi at 576, 465 P.3d at 1023.

Similarly, defense counsel's question to Silva that it was hypocritical to get angry at Nakatani for using methamphetamine while he did the same, was again a tactical effort to show he cared about Nakatani's health, regardless of his own drug use.  Given Silva's testimony in this case, this was an understandable effort to portray Silva's position in a realistic light, and we conclude defense counsel was not ineffective.

## IV.  Conclusion

Based on the foregoing, the "Judgment of Conviction and Sentence" entered on May 3, 2018, by the Circuit Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawaiʻi, January 18, 2022.

On the briefs:

Kai Lawrence,
for Defendant-Appellant

Brian R. Vincent,
Deputy Prosecuting Attorney,
for Plaintiff-Appellee

/s/ Lisa M. Ginoza
Chief Judge

/s/ Clyde J. Wadsworth
Associate Judge

**OPINION BY HIRAOKA, J.**
**CONCURRING IN PART AND DISSENTING IN PART**

I respectfully dissent. Trial by an impartial jury is a fundamental right under both the United States Constitution and the Hawai'i Constitution. State v. Williamson, 72 Haw. 97, 102, 807 P.2d 593, 596 (1991). The trial judge is the guardian of that right. "[T]he judge is the only person in a courtroom whose primary duty is to ensure the selection of a fair and impartial jury." State v. Carroll, 146 Hawai'i 138, 152, 456 P.3d 502, 516 (2020) (cleaned up).

After Silva's jury was empaneled but before opening statements were given, the trial court addressed the jury:

> And I wanted to say another thing. We went through two and a half days of jury selection to get to the process where we have our jury and three alternates. So all of you were not excused, all of you were not deferred, and *I believe someone, at least one of you have papers to present to me. I'm not going to look at it because it is too late to give me any papers to try to get excused from the jury.* We went through two and a half days of jury selection with over a hundred jurors to get to this point so we need to get the trial started and underway.

(Emphasis added.)[6] Silva contends (for the first time on appeal) that the trial court should have sua sponte conducted an investigation into potential juror bias. Rule 52(b) of the Hawai'i Rules of Penal Procedure (**HRPP**) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." An appellate court "will apply the plain error standard of review to . . . prevent the denial of fundamental rights." State v. Nichols, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006) (citations omitted).

---

[6] It was not "too late" for the trial court to investigate potential juror bias. A juror may become, or be found to be, disqualified to perform their duties at any time "prior to the time the jury retires to consider its verdict[.]" Rule 24(c) of the Hawai'i Rules of Penal Procedure (**HRPP**). "[A]lternate jurors who have already been passed for cause and survived peremptory challenges and thus have been ultimately chosen as alternate jurors for the case may be used to replace 'regular' jurors during trial when regular jurors, for some reason or another, become disqualified." State v. Ho, 127 Hawai'i 415, 424-25, 279 P.3d 683, 692-93 (2012) (citing HRPP Rule 24(c)). There were three alternate jurors on Silva's jury.

In State v. Keliiholokai, 58 Haw. 356, 569 P.2d 891 (1977), a newspaper reported about the defendant's prior convictions during the trial. The defense asked the trial court to determine whether any of the jurors had read the news article and, if so, whether the article impaired their ability to sit as fair and impartial jurors. The trial court denied the request. The jury found the defendant guilty of murder. On direct appeal the supreme court held:

> Where . . . the probabilities of prejudice are not clearly evident and it is not known whether the jurors have been exposed to the prejudicial newspaper accounts during trial, the rule is that once the existence of such news accounts has been brought to the attention of the trial court, the court must ascertain the extent and effect of the infection, and thereafter, in its sound discretion, take appropriate measures to assure a fair trial. . . .
>
> . . . .
>
> Our duty, then, on review of the actions taken by the trial court on this issue, giving due deference to the trial court's discretion, is to make an independent examination of the totality of the circumstances to determine if there are any indications that the defendant's trial was not fundamentally fair.

Id. at 358-60, 569 P.2d at 894-95 (cleaned up). The supreme court reversed the conviction and remanded for a new trial.

In Williamson, 72 Haw. 97, 807 P.2d 593, during deliberations the jury requested a dictionary to look up the words "preponderance" and "entrapment." The trial court denied the request and referred the jury to the specific instructions that defined each word. After the jury ended deliberations but before the verdict was returned, the bailiff discovered a dictionary in the jury room. The defendant moved for a mistrial. The trial court interrogated the foreperson, who denied that the dictionary was actually consulted. It was apparent from context that the foreperson was not the one who brought the dictionary into the jury room, but the trial court did not ask which juror brought the dictionary. The trial court instead asked the foreperson whether the juror who brought the dictionary read the definitions and then participated in deliberations. The

2

foreperson responded, "it was not used." Id. at 101, 807 P.2d at 595-96. The trial court denied the motion for mistrial. The jury returned a verdict of guilty as charged.

The defendant appealed. The supreme court held:

> Once there is a claim that an accused is being denied [their] right to a fair trial because of outside influences infecting a jury, the initial step for the trial court to take is to determine whether the nature of the outside influence rises to the level of being substantially prejudicial. If it does not rise to such a level, the trial court is under no duty to interrogate the jury. And whether it does rise to the level of substantial prejudice is ordinarily a question committed to the trial court's discretion. Where the trial court does determine that such influence is of a nature which could substantially prejudice the defendant's right to a fair trial, a rebuttable presumption of prejudice is raised. The trial judge is then duty bound to further investigate the totality of circumstances surrounding the outside influence to determine its impact on jury impartiality. The standard to be applied in overcoming such a presumption is that **the outside influence on the jury must be proven harmless beyond a reasonable doubt.** The trial court, in its investigation of the totality of circumstances, should include individual examination of potentially tainted jurors, outside the presence of the other jurors, to determine the influence, if any, of the extraneous matters.

Id. at 102, 807 P.2d at 596 (cleaned up) (emphasis added). The supreme court reversed the conviction and remanded for a new trial.

I acknowledge, as the majority points out, that "[t]he defendant bears the initial burden of making a prima facie showing of a deprivation that could substantially prejudice [their] right to a fair trial by an impartial jury." State v. Furutani, 76 Hawai'i 172, 181, 873 P.2d 51, 60 (1994) (cleaned up). But that assumes the defendant knows the nature of the potential deprivation. In this case, the trial court did not make a record of what "papers" the juror (or jurors) wished to "present"; nor did defense counsel ask to review the "papers" to determine whether the investigation described in Williamson, 72 Haw. at 102, 807 P.2d at 596, was warranted. Because such an investigation was not conducted, I cannot conclude that Silva's fundamental right to a fair trial by an impartial jury was not

3

compromised.  See State v. Chin, 135 Hawai'i 437, 449, 353 P.3d 979, 991 (2015).  Under the circumstances, it is possible that Silva was deprived of a fair trial by an impartial jury.

Silva did not raise the issue of double jeopardy, and in fact requested a new trial.  I concur with the majority that there was no evidentiary trial error.  I also concur with the majority that Silva's trial counsel was not ineffective during the presentation of evidence; there were strategic reasons for Silva to admit smoking methamphetamine and being hypocritical about Nakatani's own use of methamphetamine.  In my view, the evidence presented to the jury was sufficient to sustain the conviction.

For the foregoing reasons, I would vacate the Judgment of Conviction and Sentence entered on May 3, 2018, and remand this case to the circuit court for a new trial.

/s/ Keith K. Hiraoka
Associate Judge